I.D. 6184814 File No. 3900-782

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**Eastern Division**

| | | |
|---|---|---|
| **J&J SPORTS PRODUCTIONS, INC.**<br>**Plaintiff(s),**<br>**v.**<br><br>**CHARLES E. BURNS, JR., indv. and d/b/a PORTAGE THEATER d/b/a PORTAGE THEATER MANAGEMENT, INC. and PORTAGE THEATER MANAGEMENT, INC. and CHRISTOPHER BAUMAN, indv. and d/b/a PATIO THEATER CHICAGO, LLC. d/b/a BCL-4050 MILWAUKEE, LLC. d/b/a BCL-APARTMENTS, LLC. and PATIO THEATER CHICAGO, LLC. d/b/a BCL-4050 MILWAUKEE, LLC. d/b/a BCL-APARTMENTS, LLC.**<br>**Defendant(s).** | ) | **No. 2020-cv-02121** |

## PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

**NOW COMES** the Plaintiff, J & J SPORTS PRODUCTIONS, INC., by and through its attorneys, ZANE D. SMITH & ASSOCIATES, LTD., and respectfully requests that this Court enter an Order for Default Judgment pursuant to Rule 55 against Defendants, CHARLES E. BURNS, JR., indv. and d/b/a PORTAGE THEATER d/b/a PORTAGE THEATER MANAGEMENT, INC. and PORTAGE THEATER MANAGEMENT, INC. and CHRISTOPHER BAUMAN, indv. and d/b/a PATIO THEATER CHICAGO, LLC. d/b/a BCL-4050 MILWAUKEE, LLC. d/b/a BCL-APARTMENTS, LLC. and PATIO THEATER CHICAGO, LLC. d/b/a BCL-4050 MILWAUKEE, LLC. d/b/a BCL-APARTMENTS, LLC. (Defendants), and in support thereof, states as follows:

1. On April 3, 2020, the Complaint (Dkt. #1) in this matter was filed in the Northern District of Illinois, and this is a commercial piracy case arising out of the alleged unlawful

interception, receipt and/or publication of Plaintiff's Program, *"The Fight of the Century" Floyd Mayweather, Jr. v. Manny Pacquiao Championship Fight Program,* which took place on May 2, 2015 (this included all under-card bout and fight commentary encompassed in the television broadcast of the event, hereinafter referred to as the "Program").

2. On April 15, 2020, Defendant(s), CHRISTOPHER BAUMAN, indv. and d/b/a PATIO THEATER CHICAGO, LLC. d/b/a BCL-4050 MILWAUKEE, LLC. d/b/a BCL-APARTMENTS, LLC. and PATIO THEATER CHICAGO, LLC. d/b/a BCL-4050 MILWAUKEE, LLC. d/b/a BCL-APARTMENTS, LLC., were served and the responsive pleading was due on or before May 6, 2020. (Dkt. #6).

3. On July 15, 2020, Plaintiff filed a Motion for Service by Special Order of Court and Extension of Time to Serve Defendant Pursuant to Rule 4(m) (Dkt. #18), which was granted by the Court on July 16, 2020 (Dkt. #20).

4. On July 16, 2020, Defendant(s), CHARLES E. BURNS, JR., indv. and d/b/a PORTAGE THEATER d/b/a PORTAGE THEATER MANAGEMENT, INC. and PORTAGE THEATER MANAGEMENT, INC., were served and the responsive pleading was due on or before August 6, 2020. (Dkt. #21).

5. Defendants are in default pursuant to Rule 55(a).

6. The allegations in the Complaint are deemed admitted because of Defendants' default, and facts alleged in the Complaint may not be contested when a default judgment is entered. See F.R.Civ.P. 8(b)(6) (West 2014); *Black v. Lane*, 22F.3d 1395, 1399 (7th Cir. 1994); *citing Thomson v. Wooster*, 114 U.S. 104 (1885); see also Fed.R.Civ.P. 8(b)(6) ("An allegation – other than one relating to the amount of damages – is admitted if responsive pleading is required and the allegation is not denied").

7. This matter is brought pursuant to the Communications Act of 1934, 47 U.S.C. § 151 et seq. as amended by the Cable Communications Policy Act of 1984, 47 U.S.C. § 521 et seq. and the Copyright Act of 1976, 17 U.S.C. §§ 101 et seq. That the aforesaid Act provides for statutory liquidated damages up to:

a) Sixty Thousand ($60,000.00) Dollars for each violation of Section 553 of the Cable Communications Act;
b) One Hundred Ten Thousand ($110,000.00) Dollars for each violation of Section 605 of the Copyright Act.

8. Any person that is aggrieved by a Section 605 violation has a private right of action enforceable in federal court, and the aggrieved party can elect either actual damages or statutory damages. 47 U.S.C. § 605(e)(3)(C)(i); *Kingvision Pay-Per-View, Ltd. v. Scott E's Pub, Inc.*, 146 F.Supp.2d 955, 959 (E.D. Wisc. 2001).

9. A court may award statutory damages of between $1,000 and $10,000 per violations, "as the court considers just," *Id.*; citing 47 U.S.C. § 605(e)(3)(C)(i).

10. A court has great discretion in awarding statutory damages under Section 605, and if the violations were committed "willfully and for purposes of direct or indirect commercial advantage or private financial gain," the court in its discretion may increase the award of statutory damages by up to $100,000 per violation. *Id*; citing § 605(e)(3)(C)(iii).

11. Section 605 also provides that a court shall award plaintiff reasonable attorneys' fees. *Id*; citing § 605(e)(3)(B)(iii).

12. 47 U.S.C. § 605 is a strict liability statute. 47 U.S.C. § 605(e)(3)(C)(iii) (allowing for reduction in damages when it is determined that violator was "not aware and had no reason to believe that his acts constituted a violation . . ."); *Doherty v. Wireless Broadcasting Systems of*

*Sacramento, Inc.*, 151 F.3d 1129, 1131 (9th Cir.1998); *J & J Sports Productions, Inc. v. Delgado,* 2012 WL 371630, *3 (E.D.Cal. Feb. 3, 2012); *Joe Hand Promotions, Inc. v. Killeen*, Case No. 1:14-cv-03996, at p.13 (N.D.Ill. Dec. 22, 2015; Dkt. No. 80).

13. Plaintiff is seeking judgment and statutory damages under Section 605.

14. Due to Defendants failure to file an answer to Plaintiff's Complaint, Defendants have admitted all of the allegations in the Complaint, including paragraph 23 of the Complaint, which sets forth that Defendants knowingly and unlawfully published, divulged and exhibited the Program, including all under-card bout and fight commentary encompassed in the television broadcast of the event, and Defendants unauthorized interception, publication, exhibition and divulgence of the Program, and was done willfully and for purposes of direct or indirect commercial advantage or private financial gain.

15. Moreover, the Court may draw an inference of willfulness from Defendants' failure to appear and defend an action in which the Plaintiff demands increased statutory damages based on allegations of willful conduct. *Garden City Boxing Club, Inc. v. Frezza*, 476 F. Supp. 2d. 135, 138 (D. Conn. 2007); *see Time Warner Cable of N.Y. City v. Googies Luncheonette, Inc.*, 77 F.Supp.2d 485, 490 (S.D.N.Y. 1999); *see* October 24, 2016 Order, *J&J Sports Productions, Inc. v. Hortencia Geiger, et al*, Case No. 15 CV 9303, N.D. Ill., Dkt. #20.

16. That in the instant matter, there was a violation of the aforesaid provisions of Section 605 because Defendants had the Program on a theater projection screen in Defendants' establishment, Portage Theater, located at 4050 N. Milwaukee Avenue, Chicago, IL 60641, Defendants' charged a cover charge of $20.00, and the affidavit of the investigator supports the allegations contained in the Complaint. (*See* the Affidavit of the Investigator, attached hereto as Exhibit "B").

17. The Affidavit of the Investigator states that a theater projection screen in Defendants' establishment was showing the Program, which took place on May 2, 2015, the capacity of the Establishment is approximately 1,321 people, and the investigator performed head counts of 1,300+, 1,300+, and 1,300+ people in the establishment noting the capacity was at "standing room only.". *See* attached Exhibit A.

18. Pursuant to paragraph 18 of Plaintiff's Complaint:

By contract, Plaintiff, J&J SPORTS PRODUCTIONS, INC. paid for and was thereafter granted the exclusive nationwide television distribution rights of *"The Fight of the Century" Floyd Mayweather, Jr. v. Manny Pacquiao Championship Fight Program, which took place on May 2, 2015* (this included all under-card bout and fight commentary encompassed in the television broadcast of the event, hereinafter referred to as the "Program"). See Licensing Agreement attached hereto as Exhibit B.

19. That at all times complained of herein Defendants' actions could not have occurred without the willful and intentional modification of electronic equipment, the willful and fraudulent misrepresentation of a commercial establishment as a residential one, the removal of cable traps or devices designed to prevent such unauthorized exhibits, or other willful and/or international acts purposely designed to obtain our programming unlawfully.

20. As one district noted when finding willfulness under these statutes, "Signals do not descramble spontaneously, nor do television sets connect themselves to cable distribution systems." *Time Warner Cable v. Googies Luncheonette, Inc.*, 77 F.Supp.2d 485, 490 (S.D.N.Y. 1999).

21. The affidavit of the investigator supports the allegations in Count I of Plaintiff's Complaint, including paragraph 23 that alleges that Defendant has violated Section 605.

22. The Court should consider the possible lost profits to Plaintiff if Defendants had purchased the Program properly, as well as the damage Plaintiff has likely suffered by the loss of goodwill from other establishments that purchased the Program properly and lost customers to Defendants or believe that Plaintiff misled them about who their competition for broadcasting the Program was that night. Moreover, a deterrence factor should be considered as well, and Defendant should not be allowed to pay merely the amount he would have had to pay if he properly ordered the event. *Kingvision Pay-Per-View, Ltd. v. Scott E's Pub, Inc.*, 146 F.Supp.2d 955 (E.D. Wisc. 2001).

23. In *Kingvision Pay-Per-View, Ltd. v. Scott E's Pub, Inc.*, plaintiff filed a motion for summary judgment that was granted by the court. *Kingvision*, 146 F.Supp.2d at 959. The plaintiff sought statutory damages under Section 605, and the court looked at what the bar would have had to pay for the program if it was ordered correctly in order to set a baseline. *Id.* at 960. However, the court also noted that defendant should not be allowed to pay merely the amount he would have had if he had properly ordered the Program. *Id.* The court looked at other cases that used a multiplier of the baseline in cases with willful violations. *Id.* The court imposed two times the baseline for the initial statutory damages award, and five times the baseline for willful statutory damages because he advertised the event, charged a cover charge, and showed the event on five televisions. *Id.*

24. In *Time Warner Cable v. Googies Luncheonette, Inc.*, the court awarded three times the base award against defendant that was legally connected to the cable network but had not ordered the particular pay-per-view event it broadcast to its customers. *Time Warner Cable v. Googies Luncheonette, Inc.*, 77 F.Supp.2d 485, 491 (S.D.N.Y. 1999). The court also awarded four times the base amount against a defendant bar that was not authorized to receive any signals

at all from the plaintiff. *Id.* at 491. The court also entered an award of eight times the baseline for a third defendant with a history of unlawfully appropriating property. *Id.*

25. In the case at bar, Defendants would have had to pay $15,000.00 if they would have ordered the fight properly and the occupancy in the Establishment was between 400 and 500+ people. (See Rate Card attached hereto as Exhibit "C"). Pursuant to the holding in *Googies Luncheonette*, this court should enter an amount of six times the baseline of $15,000.00, four times the baseline for the initial statutory damages under Section 605 plus an additional two times for Defendants advertising the Program and charging a cover charge. See Exhibit A, B, C and D.

26. Plaintiff hereby requests an amount of Ninety Thousand and No/100 ($90,000.00) Dollars as statutory liquidated damages. (*See Kingvision,* 146 F.Supp.2d at 961 (Court awarded damages in the amount of $18,375); *Cablevision v. Maxie's North Shore Deli Corp.*, 1991 WL 585350 at 2 (E.D.N.Y. 2006) (Court awarded $25,000 for willful violations); *J&J Sports Prods. v. Smith*, No 14 CV 2955, 2014 WL 3811090, at *3 (N.D. Ill July 31, 2014)); .

27. That Plaintiff is further entitled to Three Thousand Three Hundred Seventeen and 50/100 ($3,317.50) Dollars for attorney's fees and costs. See Affidavit of Plaintiff's Counsel, Zane D. Smith, *(attached hereto and made a part hereof, as Plaintiff's Exhibit "D").*

28. Moreover, a deterrence factor should be considered as well, and Defendants should not be allowed to pay merely the amount he would have had to pay if they properly ordered the event. *Kingvision Pay-Per-View, Ltd. v. Scott E's Pub, Inc.*, 146 F.Supp.2d 955 (E.D. Wisc. 2001). Therefore, Plaintiff is asking that a Deterrence factor in the amount of Twenty Thousand and 00/100 ($20,000.00) be paid to Plaintiff.

**WHEREFORE**, the Plaintiff, J & J SPORTS PRODUCTIONS, INC., respectfully prays this Honorable Court for the entry of an Order in Plaintiff's favor and against the Defendants, CHARLES E. BURNS, JR., indv. and d/b/a PORTAGE THEATER d/b/a PORTAGE THEATER MANAGEMENT, INC. and PORTAGE THEATER MANAGEMENT, INC. and CHRISTOPHER BAUMAN, indv. and d/b/a PATIO THEATER CHICAGO, LLC. d/b/a BCL-4050 MILWAUKEE, LLC. d/b/a BCL-APARTMENTS, LLC. and PATIO THEATER CHICAGO, LLC. d/b/a BCL-4050 MILWAUKEE, LLC. d/b/a BCL-APARTMENTS, LLC., in the amount of Ninety Thousand and No/100 ($90,000.00) Dollars as statutory liquidated damages, attorney's fees and costs in the amount of Three Thousand Three Hundred Seventeen and 50/100 ($3,317.50) Dollars and a deterrence factor in the amount of Twenty Thousand Dollars and 00/100 ($20,000.00) for a total judgment in the amount of One Hundred Thirteen Thousand Three Hundred Seventeen and 50/100 ($113,317.50) Dollars, and for any additional relief for the Plaintiff this Honorable Court deems just.

Respectfully submitted,

J & J SPORTS PRODUCTIONS, INC.

By: Zane D. Smith
One of Plaintiff's Attorneys

ZANE D. SMITH & ASSOCIATES, LTD.
111 W. Washington Street, Suite 1750
Chicago, Illinois 60602
Phone: (312) 245-0031
Attorney I.D. 06184814

**CERTIFICATE OF SERVICE**

I, Zane D. Smith, on oath state that a true and correct copy of this document was electronically filed with the Clerk of the Court on August 18, 2020 using the CM/ECF system which will send notification of such filing(s) to all attorneys of record, as well as mailed a copy to the Defendants via Federal Express Under the penalties of perjury, I certify that the above statements set forth herein are true and correct.

s/ Zane D. Smith
Zane D. Smith

STATE OF ILLINOIS

COUNTY OF COOK

**AFFIDAVIT**

I, the undersigned, being duly sworn according to law deposes and says, that on May 2, 2015 at
(date)
8: 30 p.m., I entered the Portage Theater located at 4050 N. Milwaukee Ave., Chicago, IL 60641
(time) (trade name of establishment) (street address, city, state, zip code)

I paid a cover charge of $20 to enter this establishment. I ordered ONE Drink(s) from the

Waitress who was described as a white female, approx.. 50 years old, 5'3" tall, blonde hair, brown eyes, wearing a white blouse and black pants.
(name, sex, age, ethnicity, distinguishing characteristics)

I observed NO televisions located inside this establishment. The boxing event exhibition was displayed as follows:
(# of TVs)

The event was shown inside a movie theater on a full-sized theater movie projection screen via a movie theater projector located in the 2nd level projection booth at the rear of the auditorium. The estimated diagonal dimension of the full-sized theater movie projection screen is 40'.
(make, model, and size)

The movie projection screen was located at the front of the auditorium.
(specific location of TVs)

At the time I was inside the above establishment, I observed the following program on the above televisions:
2:20 in the 4th Round of the Vasyl Lomachenko v Gamalier Rodriguez boxing event. Lomachenko in yellow and blue trunks. Rodriguez in white and purple trunks with a flag pattern on the front.

(names of fighters, trunk colors of each fighter, time remaining in round)

I also observed the following distinguishing items inside the establishment: An unused ticket box office in the middle of the entry façade. Old movie posters in the lobby. A refreshment stand selling food, soda and alcoholic beverages. A very high, domed white ceiling with a floral pattern. Movie theater-type auditorium seating.
(posters, decorations, pool tables, memorabilia, etc.)

This establishment rates Fair.
(Good, Fair, Poor)



EX. A

The capacity of this establishment is approximately 1,321 people. At the time of my appearance I counted the number of patrons three (3) separate times. The head counts were 1,300+, 1,300+, 1300+. (Standing Room Only)

I left the above establishment at 8:55 pm on May 2, 2015.
(time) (date)

I also observed the following license plates on vehicles parked on the street directly outside the Portage Theater.

1) (IL) 9441430 2) (IL)E776990 3) (IL)S222872
4) (OK)202FXZ 5) (IL) LITEME 6) (IL) AV812

Date: 5/5/2015

Signature of Investigator

Gilbert Jimenez
Name of Investigator (Printed)

Total Protection Group, Inc.
Investigative Agency

(786) 325-6597
Telephone Number of Agency

**NOTARY**

On MAY 5th 2015, before me, MARICELA ALONSO Notary Public, personally appeared GILBERT R JIMENEZ — [ ] personally known to me --- or --- [X] proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity and that by his/her signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

5/5/2015
Signature of Notary

NOTARY PUBLIC OFFICIAL SEAL STATE OF ILLINOIS
MARICELA ALONSO
MY COMMISSION EXPIRES
08/13/2016

MAYWEATHER PROMOTIONS, LLC
4616 WEST SAHARA AVENUE, NO. 290
LAS VEGAS, NV 89102

TOP RANK, INC.
748 PILOT ROAD
LAS VEGAS, NV 89119

April 23, 2015

J&J Sports Productions, Inc.
2380 South Bascom Avenue, Ste. 200
Campbell, CA 95008

Attention: J.M. Gagliardi

RE: CLOSED CIRCUIT TELEVISION LICENSE AGREEMENT

Floyd Mayweather v. Manny Pacquaio (the "**Bout**")
Scheduled 12-Round World Super Welterweight Title Bout

Plus selected undercard bouts
(undercard fighters subject to change)

Saturday, May 2, 2015
MGM Grand Garden Arena
Las Vegas, Nevada

Gentlemen:

This will confirm the terms of our agreement whereby MAYWEATHER PROMOTIONS, LLC ("**MPL**") and TOP RANK, INC. ("**TR**") (collectively "**Licensor**") hereby grant to you ("**you**" or "**Licensee**") the exclusive license to exhibit, only within the fifty states of the United States of America and the District of Columbia and Canada (the "**Territory**"), Licensor's live telecast of the captioned Bout and accompanying undercard matches (the "**Event**"), simultaneously with the Event, only at commercial closed circuit television exhibition outlets, such as bars, clubs, lounges, restaurants and the like, each with a fire code occupancy **capacity not to exceed 500 persons per outlet** (except for outlets within casinos where the seating capacity may exceed 500 persons per outlet), located within the Territory. The exhibition rights granted herein do not include any rights in the Commonwealth of Puerto Rico or Mexico, or transmissions to hotel guest rooms, in-flight aircraft or other transportation facilities. Any proposed closed circuit exhibition of the Event at arenas, racetracks or theaters shall be subject to the prior written approval of Licensor, which approval may be granted or refused in the discretion of Licensor. The Territory shall also not include, and you shall have no exhibition rights in, Clark County, Nevada, except that you shall have exhibition rights in (i) in Laughlin and Mesquite, Nevada, and (ii) separate rooms within casinos and hotels (not including sports books) where an admission fee is charged.



Ex. B

1. License Fee. As full and complete compensation for the rights granted to Licensee by Licensor, you shall pay to Licensor the license fee calculated as follows:

(a) Licensee shall pay the Minimum Financial Guarantee (the "**Minimum Financial Guarantee**"), pursuant to the provisions of paragraph 2;

Then, the amount of all revenues which you receive from or related to the Event ("**Gross Revenues**") in excess of the (which threshold amount Licensee shall retain in recoupment of the Minimum Financial Guarantee) which Licensee receives from all closed circuit television exhibitions of the Event in the Territory shall be payable:

(i) An amount shall be paid to Licensee in full reimbursement of substantiated (x) sales commissions paid to independent third parties, not to exceed of Gross Revenues; (y) out-of-pocket marketing for advertising and publicity purposes, for exhibition locations which you license directly to operators, other than Licensee or its affiliates, and credit card fees and costs, all not of Gross Revenues; and (z) Licensee's actual costs and expenses in establishing and generating a call center for the Event;

(ii) shall be paid to Licensee; and

(iii) All remaining funds shall be paid: to Licensor and to Licensee.

(b) All amounts which are to be deducted or withheld by your sublicensee exhibitors, sales agents or distributors from payments to you or your sublicensees shall be subject to the mutual agreement of Licensor and Licensee but shall not exceed of Gross Revenues (excluding authorization fees) from each outlet from exhibition of the Event.

(c). In the event that you should sublicense an outlet for a fixed lump sum or for a license fee which includes a guaranteed amount which is not exceeded by your share of revenues from that outlet, you shall include in gross revenue hereunder the amount equal to such lump sum or guarantee.

(d) You shall provide the services of a duly authorized representative of your organization who shall be present at each licensed and sublicensed outlet immediately prior to and during the telecast of the Event, to monitor compliance with the terms of this Agreement and report on attendance figures and the collection of admission fees.

(e) Licensee shall be responsible for all of its local advertising materials, such as posters, press kits and slides, including the option to use Event posters to be supplied by Licensor.

2. Minimum Financial Guarantee and License Fee Payments.

(a) As a minimum guarantee and non-refundable advance against the License Fee due to Licensor pursuant to Paragraph 1 of this Agreement for the Event, you shall pay to Licensor the sum of

(b) The Minimum Financial Guarantee amount shall be paid by bank wire delivered to:

(c) **Payment of all Gross Revenue amounts in excess of the Minimum Financial Guarantee for the Event shall be due and payable to Licensor not later than business days after the Event, by bank wire to the above bank account.**

(d) In the event of a cancellation of the Event, pursuant to Section 13 of the Standard Terms and Conditions hereto, any Minimum Financial Guarantee which you have paid shall be promptly refunded in full.

3. Compatible Decoding Equipment. You and your sublicensees shall be responsible to obtain, at your or their cost and expense, either:

(a) Authorization to receive the Event through the services of one or more direct satellite suppliers ("DSS"), such as DirecTV or DISH Network, to be selected by you and approved by Licensor in writing in advance; or

(b) If Licensor licenses VUBIQUITY to distribute the Event by C-Band and so notifies Licensee, authorization to receive the Event through VUBIQUITY.

(c) DSS and VUBIQUITY, if applicable, shall be responsible for the encoding and decoding of their retransmitted signals.

(d) You shall not charge decoder rental or authorization fees to your sublicensees in excess of per decoder or authorization. Any additional equipment charges to your sublicensees shall be at your cost.

4. Addressing of Decoders.

(a) Licensor shall deliver either, as Licensor shall elect in its discretion, (i) the encrypted transmission of the video and audio signal of its telecast of the Event to a domestic satellite or other delivery point from which the signal is capable of being received by DSS and VUBIQUITY, for redistribution to your designated outlets or (ii) by fiber optic cable to a delivery

point at which the signal is capable of being received by DSS and VUBIQUITY, for redistribution to your designated outlets. DSS and VUBIQUITY, if applicable, as the case may be, shall have the responsibility to address and authorize decoders for your authorized sublicensees. You shall be responsible for all charges for addressing and authorizing your sublicensees.

(b) Licensor shall not have any responsibility for your decoder authorization fees, and Licensor shall not have any responsibility or liability to you or your sublicensees for any technical failures which may occur in connection with the authorizing of decoders for your sublicensed closed circuit exhibition outlets or in connection with any retransmission or authorizing by DSS or VUBIQUITY.

**(c) You shall instruct DSS and VUBIQUITY, if applicable, to provide directly to Licensor, on the first business day after the Event, their complete final sublicense reports which shall indicate the name, address and city of each sublicensed outlet and the decoder number for each sublicensed outlet.**

5. Pay-Per-View Exhibitions, Delayed Pay Cable Telecasts and Online Internet Transmissions.

You acknowledge that Licensor will be licensing the live and delayed cable television, direct broadcast satellite television and digital online internet transmissions and exhibitions of the Event in the Territory on a pay-per-view basis, with subsequent pay cable delayed telecasts, and that you shall have no interest or participation in such exhibitions.

6. Anti-Piracy.

**You and your sublicensees shall promptly advise Licensor of any piracy (i.e., unauthorized use or proposed use) of the telecast in the Territory. Licensor and Licensee, acting jointly, shall have the right to commence or settle any claim or litigation arising out of the alleged piracy, use or proposed use of the telecast in the Territory. Licensor and Licensee shall notify each other in writing and shall consult with each other and mutually agree before commencing or settling any such claim or litigation in the Territory. Any damages, whether statutory, compensatory, punitive or otherwise, which Licensor or Licensee may recover from the theft, piracy, copying, duplication, unauthorized exhibition or transmission of the Event in the Territory, after payment of reasonable legal fees and disbursements, shall constitute Gross Revenues from the Event, to be shared by, and distributed to, Licensor and Licensee as provided in Paragraph 1 of this Agreement. Licensee shall advance all required legal fees and disbursements, subject to recoupment from any applicable recovery, and shall report all expenses, settlements and recoveries to Licensor on a quarterly basis. Your sublicensees shall have no right to commence or settle any claim or litigation arising out of the alleged piracy of the telecast hereunder without the prior written consent of Licensor. Licensor agrees that you may retain the services of Thomas P. Riley Esq. of Los Angeles, California to pursue anti-piracy claims in the Territory or another attorney approved by Licensor.**

7. Telephone Call Center. During approximately the 30-day period prior to the Event date, Licensee, at its cost and expense, except as otherwise expressly provided herein, shall establish,

staff and maintain a national telephone call center, to receive and service telephone inquiries and liaison from owners and operators of potential sublicensed exhibition outlets.

8. Private Showings. Licensor shall have the right, at its cost and expense and upon written notice to you, to conduct or authorize others to conduct two (2) complimentary private showings of the telecast of the Event in up to four (4) cities within the Territory, for an audience not to exceed persons at each location, with no admission charge and no advertising or advance publicity for such private showings.

9. Attachments. Annexed to this Agreement as exhibits are the following documents, the terms and conditions of which are incorporated herein as if set forth in their entirety:

(a) Closed Circuit Television Sublicense Agreement which you and your sublicensee shall complete and sign with respect to each closed circuit television outlet you may sublicense. YOU SHALL NOT ENTER INTO ANY SUCH AGREEMENT WITHOUT FIRST OBTAINING, PRIOR TO THE TELECAST OF THE EVENT, THE WRITTEN CONSENT AND APPROVAL OF LICENSOR TO THE TERMS THEREOF.

(b) Closed Circuit Television Standard Terms and Conditions which shall apply to this Agreement as well as to the Closed Circuit Television Sublicense Agreement. YOU SHALL ATTACH A COPY OF THE STANDARD TERMS AND CONDITIONS TO EACH SUCH SUBLICENSE AGREEMENT.

10. Defaults.

(a) Your failure to deliver the Minimum Financial Guarantee as provided in Paragraph 2 hereof or to pay the license fee as provided in Paragraph 1 hereof or to pay the signal delivery fees or equipment expenses as provided in Paragraph 3 hereof or to comply with any other material term or condition of this Agreement or of the annexed agreements or the Standard Terms and Conditions shall permit Licensor, in addition to all of its other rights and remedies, to cancel this Agreement with you at any time without any further liability or obligation to you and to retain all monies paid to Licensor prior to such cancellation. Provided, however, that before Licensor may exercise any remedy with respect to any such default, Licensor must (i) provide Licensee with written notice specifying such default and (ii) if and to the extent that time reasonably permits prior to the Event, provide Licensee with up to seven (7) days after Licensee's receipt of such default notice within which to cure such default.

(b) If, in violation of the provisions of this Agreement, you or a sublicensee exhibits the Event in an outlet with a fire code occupancy limit in excess of persons (except casino locations) or at a theater, racetrack, or arena without Licensor's prior written approval, then, in addition to the license fee for such outlet as provided in Paragraph 1, and in addition to and not in limitation of or in lieu of any other rights or remedies Licensor may have under this Agreement, at law or in equity, including, without limitation, Licensor's rights to indemnification hereunder, Licensee shall immediately pay to Licensor an amount equal to the following for each such outlet that violates the aforesaid restriction: the sum of the fire code occupancy capacity of the outlet multiplied by the greater of of the license fee you receive from such outlet or of the face amount of the highest ticket or admission price for the Event at that outlet. You agree that this

payment is reasonably calculated to reimburse Licensor for its damages in the event of such violation of this Agreement.

11. No Packaging with Other Events.

You shall not sublicense closed circuit television rights to the Event to exhibitors as part of a package which includes other boxing programs or bouts not included in this Event without the prior written consent of Licensor.

12. Reports, Collection and Accounting.

(a) You shall be responsible for collection of all monies from outlets, and shall make all payments and provide all reports pursuant to Paragraph 4 of the Closed Circuit Television Standard Terms and Conditions and shall provide Licensor with copies of all reports received from sublicensed outlets. You shall distribute to Licensor all amounts due for exhibition rights to the Event, with no deductions, set-offs or holdbacks whatsoever.

(b) In addition to the reports required in the Closed Circuit Television Standard Terms and Conditions, you shall provide Licensor with:

**Separate reports no later than hours, hours, and hours before the Event and week following the Event, including the name, location and license fee for each closed circuit exhibition outlet and including method of signal delivery to each outlet and the information required in Paragraph 10(d) of the Closed Circuit Television Standard Terms and Conditions.**

**Licensor's representatives shall have the right to visit your offices and each outlet at any time during normal business hours prior to the Event and after the Event to obtain and verify such information, in person or electronically, and to make arrangements for the payment of all license fees due to Licensor promptly following the Event.**

All contracts and reports shall be sent to:

Mayweather Promotions, LLC
4616 West Sahara Avenue, No. 290
Las Vegas, NV 89102
Attn: ____________________

Top Rank, Inc.
Attn. Dave Lopez, CFO
748 Pilot Road
Las Vegas, NV 89119

13. Entire Agreement. This Agreement supersedes and terminates all prior agreements between the parties hereto and their affiliates with respect to the subject matter contained herein, and this Agreement embodies the entire understanding between the parties relating to such subject matter, and any and all prior correspondence, conversations and memoranda are merged herein and shall be without effect hereon.

Very truly yours,

MAYWEATHER PROMOTIONS, LLC

By: ______________________
Authorized Signature

TOP RANK, INC.

By: ______________________ , Secretary
Authorized Signature

Please confirm your agreement with the above by signing and returning the attached copy of this letter. This Television License Agreement shall not become effective unless and until Licensor has accepted and signed this Agreement and returned one copy to you.

ACCEPTED AND AGREED:

J&J Sports Productions, Inc.

By: Joseph M. Gagliardi
President

BY SIGNING THIS AGREEMENT, LICENSEE ACKNOWLEDGES HAVING READ THE CLOSED CIRCUIT TELEVISION STANDARD TERMS AND CONDITIONS AND CONFIRMS ITS AGREEMENT THERETO. NO CHANGES ARE AUTHORIZED IN THE CLOSED CIRCUIT TELEVISION STANDARD TERMS AND CONDITIONS.

www.boxingseries.com
J&J SPORTS PRODUCTIONS INC.

# Rate Card
# "The Fight of the Century"

## Saturday, May 2, 2015 9pmET/6pmPT

**Live! from the MGM Grand Garden Arena Las Vegas, Nevada.**

## Manny Pacquiao
**vs**
## Floyd Mayweather Jr.

| Capacity | Price |
|---|---|
| 1 - 100 | $3,000.00 |
| 101 - 200 | $6,000.00 |
| 201 - 300 | $9,000.00 |
| 301 - 400 | $12,000.00 |
| 401 - 500 | $15,000.00 |

**Casinos Minimum Guarantee of $10,000.00** Plus $40.00 per person above 250

- **DirecTV/DISH** Standard Activation is included
- **Cable clients** – provider will bill Signal Fee.
- Commercial Public Viewing and Business Viewing pricing for this event is based on **Fire Code Occupancy**

**All Commercial locations that have been licensed to carry this event must have a valid license agreement from the OFFICIAL CLOSED-CIRCUIT PROVIDER,** J&J Sports Productions Inc. There is NO OTHER LEGAL LICENSOR. **Any location that has not been licensed by this provider will be considered a PIRATE and TREATED ACCORDINGLY.**

2380 South Bascom Ave, Suite 200• Campbell, CA 95008• Tel (408) 369-8022• Fax 844-230-2242

EX. C

I.D. 6184814 File No. 3900-782

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**Eastern Division**

| | | |
|---|---|---|
| **J&J SPORTS PRODUCTIONS, INC.** <br><br> **Plaintiff(s),** <br> **v.** <br><br> **CHARLES E. BURNS, JR., indv. and d/b/a PORTAGE THEATER d/b/a PORTAGE THEATER MANAGEMENT, INC. and PORTAGE THEATER MANAGEMENT, INC. and CHRISTOPHER BAUMAN, indv. and d/b/a PATIO THEATER CHICAGO, LLC. d/b/a BCL-4050 MILWAUKEE, LLC. d/b/a BCL-APARTMENTS, LLC. and PATIO THEATER CHICAGO, LLC. d/b/a BCL-4050 MILWAUKEE, LLC. d/b/a BCL-APARTMENTS, LLC.** <br><br> **Defendant(s).** | ) | **No. 2020-cv-02121** |

**AFFIDAVIT OF ZANE D. SMITH**
**IN SUPPORT OF THE PETITION FOR FEES**

I, Zane D. Smith, of the law firm of Zane D. Smith & Associates, Ltd., attorney for the Plaintiff, J&J Sports Productions, Inc., being duly sworn depose and state that:

1. I am the attorney with the primary responsibility of the representation of Plaintiff, J&J SPORTS PRODUCTIONS, INC. In this capacity, I have personally undertaken, directed and overseen the representation of Plaintiff relative to this litigation. Accordingly, I have personal knowledge of the facts set forth here and if called upon to do so, could testify competently thereto.
2. My ordinary and customary billing rate for my time on this matter was $400.00 per hour.



EX.D

3. Time is kept and maintained as an ordinary business record and if called to testify before this Honorable Court I would competently testify that the firm of Zane D. Smith & Associates, Ltd., has incurred the following time and expenses in the prosecution of the matter of *J&J Sports Productions, Inc. v. Charles E. Burns, et al.*, case number *20-cv-02121*:

4. Plaintiff filed its Motion for Default Judgment on August 18, 2020 (Dkt. #22), and a hearing date for September 17, 2020 (Dkt. #23), and below are the fees and costs after filing the Motion for Default Judgment.

| **Date** | **Description** | **Provider** | **Time** |
|---|---|---|---|
| 04/03/2020 | Prepare and file Complaint | ZDS | 2.00 |
| 04/03/2020 | Preparation of Summons and required District Court documents. | AZ | 0.50 |
| 04/16/2020 | File Return of Service for Defendants | AZ | 0.25 |
| 05/04/2020 | File Return of Service for Defendants | AZ | 0.25 |
| 05/04/2020 | Prepare and file Motion for Extension of Time | ZDS | 1.00 |
| 07/15/2020 | File Return of Service for Defendants | AZ | 0.25 |
| 07/15/2020 | Prepare and file Motion for Extension of Time | ZDS | 1.00 |
| 07/22/2020 | File Return of Service for Defendants | AZ | 0.25 |
| 08/18/2020 | Draft Motion for Default Judgment | ZDS | 1.00 |
| 09/17/2020 | Attend hearing on Motion for Default Judgment | ZDS | 1.00 |
| **Total Attorney (ZDS;BGS) Hours = 6 hours at $400.00 per hour:** | | **$** | **2,400.00** |
| **Total Paralegal (AZ) Hours = 1.50 hours at $125.00 per hour:** | | **$** | **187.50** |
| **Total Attorney's and Paralegal Fees:** | | **$** | **2,587.50** |

| | | |
|---|---|---|
| **Expenses** | | |
| **Filing Fee** | **$400.00** | |
| **Process Server** | **$330.00** | |
| **Total Expenses:** | | **$ 730.00** |
| **TOTAL ATTORNEYS' FEES, PARALEGAL FEES & EXPENSES** | | **$ 3,317.50** |

Further Affiant Sayeth Not

Zane D. Smith

ZANE D. SMITH & ASSOCIATES, LTD.
111 W. Washington Street, Suite 1750
Chicago, Illinois 60602
Ph. (312) 245-0031
Zane@zanesmith.com

Subscribed and Sworn to Before Me
this 18th day of August, 2020.

NOTARY PUBLIC

MARK A SMITH
Official Seal
Notary Public – State of Illinois
My Commission Expires Mar 20, 2021